[Civ. No. 2073.    Third Appellate District.—March 18, 1920.]

ARANETTA HILL, Appellant, v. CITY OF OXNARD (a Municipal Corporation), et al., Respondents.

[1] HIGHWAYS—RIGHTS OF PUBLIC AUTHORITIES.—As a general proposition, the public authorities have the right to the use of the entire right of way that has been acquired for highway purposes, and to that end to remove from it trees, embankments, or other obstructions which in any way interfere with its use for public travel.

[2] ID.—GRANT OF STRIP TO COUNTY—RESERVATION OF GROWING TREES —LIMITATION ON SUBSEQUENT USE.—Where the owner of land deeds a strip thereof to the county for highway purposes, reserving all of the trees growing thereon and the right to trim and remove them, and the supervisors accept the dedication subject to such reservation, a municipal corporation which subsequently transforms such highway into one of its streets takes it burdened with the exceptions contained in the deed to the county, and may not, without her consent, and without compensation, remove the trees because they interfere with the plans of the municipal corporation in the matter of paving and curbing the street.

[3] ID.—DESTRUCTION OF TREES BY MUNICIPALITY—POLICE POWER.— The cutting down or destroying of trees growing in a public street without the consent of the owner of the fee-simple title to the trees, and without compensation, cannot be justified on the ground that it is an exercise of the police power for the benefit of the health and convenience of the community.

[4] ID.—CONTRACT RESERVING TREES—RIGHT OF STATE OR MUNICIPALITY TO IMPAIR.—The deed of a strip of land to the county for highway purposes, reserving to the grantor the trees growing thereon, which dedication is accepted by the supervisors subject to such reservation, constitutes an executed contract, within the meaning of the provision of article I, section 10, of the federal constitution that "No state shall pass any law impairing the obligation of contract," and fixes and limits the rights of the respective parties thereto; and it is beyond the power of the state of California, or any municipal subdivision thereof, by any ordinance or resolution, to impair the obligations of such contract.

[5] ID.—DESTRUCTION OF GROWING TREES—INJUNCTION.—Where the owner of land conveys a strip thereof to the county for highway purposes, reserving the fee-simple title to the trees growing thereon, an injunction may be had to prevent the unlawful cutting down or destroying of such trees by a municipal corporation which subsequently transforms the highway into one of its streets.

APPEAL from a judgment of the Superior Court of Ventura County. Merle J. Rogers, Judge. Reversed.

The facts are stated in the opinion of the court.

Orr & Gardner for Appellant.

Chas. F. Blackstock for Respondents.

ELLISON, P. J., *pro tem.*—The plaintiff is now and for more than forty-six years has been the owner of certain real estate in Ventura County. She had created on her land an avenue for her convenience and pleasure, and planted thereon as early as 1880 some fifty-five walnut trees of the variety known as black walnuts in parallel rows, the rows being some twenty feet apart. They have grown to be large trees, some of them thirty inches in diameter, and having been planted by her own hands in her younger days, she is, naturally, very much attached to them. About the year 1898, and prior to the incorporation of the city of Oxnard, the board of supervisors of Ventura County desired a roadway through the property of the plaintiff, taking in as part thereof the strip upon which said walnut trees were growing. At first she refused to allow them to do so. Thereafter they called in a body at her house and discussed the matter with her. At that time she stated that under no circumstances would she sell a right over her real property for road purposes to the county; stating, as her objection, that the roadway would destroy the walnut trees which she had planted years before and which she prized so highly. She feared if a right of way were granted it might cause the trees to be removed at some future date. The board of supervisors assured her that if she would deed the roadway, the county would not ask her to deed the trees, but would allow her to keep title to the same, and promised her that under no circumstances would they remove them or cut them down without her consent, the county specifically offering at that time to put through the roadway, and subsequently maintain it in such a way that her trees would not be injured, and that she would retain the sole title to them. After this understanding had been reached the plaintiff executed to the county a deed for the desired right of way.

46 Cal. App.—40

This deed, after describing the right of way by metes and bounds (said description covering the land upon which said three rows of trees were standing, in addition to other lands), contains this exception: "reserving, however, to the party of the first part from said grant of land, all of the trees growing on said three strips of land above described and reserving, also to the party of the first part, the right to trim or remove said trees, or any of them at any time, provided that the party of the second part shall have the right to trim said trees as may be necessary to prevent their growing limbs interfering with the use of said strip of land for road purposes."

After this written dedication of the property, the board of supervisors accepted the same, and in their acceptance of said right of way for road purposes used the following language: "It is ordered that the deed from Aranetta Hill and John G. Hill, dated March 15th, 1898, for a strip of land for a roadway on the west end of Fifth street, in the town of Oxnard, westerly (etc.), be accepted, subject to the terms and conditions therein contained, which the county of Ventura in accepting said deed agrees to comply with, and the said strip of land in said deed described and conveyed to the county of Ventura is hereby established and declared to be a public road and highway, and the same is hereby named and established and known as Hill Avenue."

About the year 1903 the city of Oxnard was incorporated as a municipal corporation of the sixth class, its corporate bounds including the strip of land referred to on which are the three rows of walnut trees, and said strip of land, being a continuation thereof, is now known as Fifth Street, in the city of Oxnard.

The plaintiff recently ascertained that the city of Oxnard, through its board of trustees, threatened to cut down and remove the walnut trees, and each and all of them, against her will and without her consent and without awarding her any compensation. Upon learning this, she brought suit, and asked for a perpetual injunction restraining the city of Oxnard from cutting down, removing, killing, destroying, or damaging said walnut trees.

After trial the court found, among other facts, that said trees are a public nuisance, that they interfere with and prevent the construction of sidewalks, curbs, and gutters along

the portion of Fifth Street where said trees are growing, and prevent the grading of said Fifth Street to the official street line grade, and interfere with and prevent proper drainage of the portion of said city in proximity to said trees; that they were injurious to the health and safety of the city of Oxnard; and denied the plaintiff any relief. From this judgment she appeals.

The real question presented by this appeal for consideration and decision is whether the city of Oxnard, under the circumstances as they appear in the record, has any right to destroy said walnut trees, or in any way injure or damage them.

[1]    As a general proposition, it may be stated that the public authorities have the right to the use of the entire right of way that has been acquired for highway purposes, and to that end to remove from it trees, embankments, or other obstructions which in any way interfere with its use for public travel.    Or, as stated in Elliott on Roads, second edition, section 645, "Public highways belong, from side to side and end to end to the public, and any permanent structure or prepresture which materially encroaches upon a public street and impedes travel is a nuisance *per se*, and may be abated, notwithstanding space is left for the passage of the public."

Generally, when a piece of land is dedicated to the public by its owner, its entire width is dedicated, and the principles above stated declaring the rights of the public therein are applicable to such highways.    A typical case applying these general principles is *Vanderhurst* v. *Tholcke*, 113 Cal. 147, [35 L. R. A. 267, 45 Pac. 266].    There was a street in the full meaning of the term.    The land had not been dedicated with exceptions and reservations.    No right had been reserved by its former owner to keep trees thereon or to plant others.    After the town became a city and after the land had become a street the plaintiff planted in the right of way certain trees and they were permitted to grow to a considerable size.    They became an obstruction to the free use of the city and were declared an unlawful interference with the use of the street, and in the litigation that arose, the court, following the line of decisions above referred to, held that the city had a right to remove them.

Cases like the above and the principles upon which they were decided are not controlling and of but little value in disposing of cases like the one now under consideration where special property and contract rights are involved and the dedication a restricted one. Sometimes the dedication is so worded that the public does not acquire an easement perfect in all details and is not given an unlimited right to use all the surface for public purposes between the side-lines of the right of way that is dedicated. There may be a part of it excepted and reserved to the owner, and in such case the public gets the right of way so dedicated burdened with the reservations or lessened by the exceptions contained in the dedication. Such highways are very rare, and as a result but few cases can be found defining the rights of the parties, in such circumstances.

In Elliott on Roads and Streets, section 122, it is said: "Where the common-law dedication is an express one, and there is a writing evidencing it, the extent of the dedication will be measured by the writing, except where the use controls and has been of such a character and so long continued as to change the extent of the easement. If the instrument creating the easement annexes terms and conditions, the public is bound by them in case of an acceptance."

"It is well settled that in dedicating land to the public the dedicator may impose such reasonable conditions, restrictions and limitations as he may see fit, and in order to vest the easement in the dedicatee the terms of the dedication must be strictly complied with." (13 Cyc. 456.)

"The dedicator may prescribe the terms, restrictions and limitations on which the land is given." (8 Ruling Case Law, p. 909.)

"Dedication of a street must arise from some act of the owners of the land. (*State* v. *Society,* 44 N. J. L. 502; *Ayers* v. *Pennsylvania Ry. Co.,* 48 N. J. L. 44, [3 Atl. 885].) The public cannot get any more than he gives; and if he dedicates a street one hundred feet wide, subject to the restrictions and use as mentioned, the public takes subject to the restrictions mentioned. The filing of a map and selling lands thereby would be evidence of a dedication, but if he does not file the map and did not adopt it by reference thereto in the deeds, the map filed would not be conclusive evidence against him, and if the map he made and sold lots

by shows the trees to be set out as testified to by the surveyor, it would be a question of fact to be determined by judicial authority as to whether the dedication of Landis avenue was not subject to the setting out and existence of the trees in accordance with Mr. Landis' scheme of ornamentation and use of the avenue.'' (*State* v. *Vineland etc. Co.*, 56 N. J. L. 474, [23 L. R. A. 685, 28 Atl. 1039].)

The same controversy went to the supreme court of New Jersey two years later and the right of the city to destroy the trees was denied. In the last case it is said: "It is a settled legal rule that land may be dedicated to a restricted public use, and if accepted, must be taken for the limited purpose only.'' (*Young* v. *Landis Township*, 73 N. J. L. 266, [62 Atl. 1133].) In that case the reservation of the trees in the act of dedication was proved by circumstances as indicating the intent of the dedicator. In this case, the exception is contained in the deed of a right of way in express language.

The trees referred to in the deed made by the plaintiff and her husband to the county of Ventura are real estate. "The timber was part and parcel of the real property referred to in the deeds. (Civ. Code, secs. 658, 660.) The title to it in fee simple had been in Sears prior to the execution of the deeds by him, and it being by the language thereof clearly exempted from the operation of the deed, this title in fee simple remained where it had been.'' (*Sears* v. *Ackerman*, 138 Cal. 586, [72 Pac. 172].)

The deed, in which the city of Oxnard, as successor to the county of Ventura, claims a right of way for highway purposes, does not convey all the real estate to the county between the side-lines of the proposed highway. It excepts therefrom a part of the real estate that would otherwise have passed.

The plaintiff is in the same position as would be a grantor of a right of way to a county for a highway, who, in his deed, after describing a piece of land eighty feet wide, reserved a strip through the entire length thereof in its center ten feet wide, upon which was already established a blue grass plat with shade trees thereon. Such parks are not infrequent in the center of highways in some of our most important cities, notably in the city of Washington. In such a case no one would claim that the grantee in a deed,

although a municipal corporation, would have the right, without the consent of the grantor, to appropriate such excepted plat ten feet in width for city purposes, to plow up the blue grass, cut down the trees, and put the excepted strip in a condition for public travel, or, perhaps, utilize it for the purpose of a public sewer.

[2] When the city of Oxnard transformed the highway through plaintiff's land into one of the streets of the city, it took it burdened with the exceptions contained in the deed from the plaintiff to the county.

"The creation of a city, village, or incorporated town, or the extension of its limits, vests in the municipality the power and jurisdiction to regulate and control highways which have hitherto been under the control of the county or township organization and transfers to the city or village the duty of maintaining and repairing them, unless the statute otherwise provides." (Dillon on Municipal Corporations, sec. 1138.)

"Where a municipal corporation succeeds by annexation to the rights and powers of a town, it cannot repudiate a franchise granted by the town to a telephone company to construct and maintain poles, wires, etc., in the streets. The town in granting such right acted as agents for the state in its governmental and not in its proprietary capacity and therefore neither the town nor any other municipality succeeding to its governmental powers, could have any right to repudiate the contract or take back the grant without the consent of the telephone company." (*People ex rel. Rockwell* v. *Chicago Telephone Co.*, 245 Ill. 121, [91 N. E. 1065]; and same case in 245 Ill. 154, [91 N. E. 1070]; also, Elliott on Roads, 2d ed., sec. 116; *Belle* v. *Glenville,* 27 Ohio C. C. 181.)

We start with the fact that these forty-five walnut trees, together with the ground occupied by them, are the property of the plaintiff in this case, she having the title therein in fee simple, good against all the world. The defendant, without her consent, and without compensation, purposed to take this property and appropriate it to the uses of the city. We are of the opinion that this contemplated procedure is unauthorized by law and may not be carried out.

The fact that these trees interfere with defendant's plans in the matter of paving and curbing Fifth Street is not a

justification for taking plaintiff's property. It might be convenient to it to take a strip of her land lying south of Fifth Street and thereby widen the street to that extent for sewer or sidewalk purposes, but no one would contend that it could do so without her consent, or without a judgment in condemnation proceedings.

The plaintiff's title to these trees and to the land upon which they stand is just as perfect in her as is the title to her holdings lying south of the highway, and the city can no more take the one in the method proposed than it can take the other.

Counties and municipalities often enter into contracts which subsequently prove a source of inconvenience. But such inconvenience is no justification for their repudiation. Thus, South Bend, Indiana, granted to a railway company a franchise to lay a double track railway upon certain of its streets. The company built a single track, but before it had its double track completed the city repealed so much of the ordinance as related to double tracks. Whereupon suit was brought. The city attempted to justify its action under the police power. It was claimed that the presence of two tracks in the street was an inconvenience to the public and a source of danger and that in the exercise of the police power the city could prevent the laying of the second track. The case went to the United States supreme court, and in deciding the case this language was used: "If the police power can lay hold of such inconveniences and make them the bases of the rights to repeal such ordinances, the contract would be abrogated because of the growth in population and business the railroad was intended to secure." And, again, it is said: "Obviously, upon the clearest consideration of law and justice, the grant of authority to defendant when acted upon becomes an irrevocable contract and the city was powerless to set it aside." (*Grand Trunk R. R. Co.* v. *South Bend*, 227 U. S. 555, [44 L. R. A. (N. S.) 405, 57 L. Ed. 633, 33 Sup. Ct. Rep. 307, see, also, Rose's U. S. Notes].)

The court finds that the trees obstruct the flow of the drainage water from the streets of Oxnard; that it is stopped in its course by the presence of these trees, and there is evidence that a pool of water is formed near the trees,

which becomes stagnant and is detrimental to the health of the people of the city of Oxnard and is a public nuisance.

It occurs to us that the existence of the nuisance is attributed to the wrong party and the wrong source. The trees are not a public nuisance. They are not injurious to health. A pool of water standing near them may be injurious to the public health and may be a public nuisance, but such a pool of water is formed, not by the plaintiff, but by the defendant in not taking care of the surface water. It is permitting it or causing it to flow against the plaintiff's property, where it has no outlet, and where it remains until it is stagnant. If the surface water flowing down the streets were stopped by the higher lands of the plaintiff on the south side of Fifth Street, and formed a pool, no one would claim that the city, on the ground that the pool was a public nuisance could, without the plaintiff's consent, cut a drainage canal through her farm. Neither can it, in order to get an outlet for its drainage, destroy her fee-simple title in and to the trees involved.

[3] The contemplated action of the city of Oxnard was attempted to be justified on the ground that it is an exercise of the police power for the benefit of the health and convenience of the community, but we know of no decision which extends the police power of a municipality to such contemplated end. The plaintiff in asserting her rights is buttressed by a provision of the constitution of the state of California, wherein it is provided in general terms that private property shall not be taken or damaged for public use without just compensation first having been ascertained and paid.

In *Nickey* v. *Stearns Ranchos Co.*, 126 Cal. 152, [58 Pac. 459] it is said: "But in this state private property may not be taken or damaged for private use at all. It may be taken only for public use after just compensation made or paid. (Const., art. I, sec. 14.) It is beyond question that the digging and maintaining of ditches and drains across private lands is a taking of property."

The record shows that the defendant in this case desires to remove some of these trees for the purpose of getting proper drainage for its water. In other words, it purposes to put a drain, without plaintiff's permission, across and through that part of her real estate which she expressly

reserved in the deed she executed to the county. [4] She is further justified in the position she takes by that provision of the federal constitution, article I, section 10, wherein it is provided: ''No state shall pass any law impairing the obligation of contract.'' Her deed to the county of Ventura was an executed contract, and it fixes and limits the rights of the respective parties thereto, and it is beyond the power of the state of California, or any municipal subdivision thereof, by any ordinance or resolution, to impair the obligations of such contract.

The proposed action of the city of Oxnard in passing its ordinance, declaring that these trees interfere with the laying of sidewalks in accordance with the ordinances of the city, and prevent the free flow of the surface water, and therefore shall be taken and used by the city, is a violation of the plaintiff's rights, as outlined, fixed and determined by the express provisions and terms of her written contract.

Her contract cannot be impaired by resort to what is known as the police power. This principle is very clearly discussed in one of Justice Harlan's luminous opinions, in deciding the case of *New Orleans Gas Co.* v. *Louisiana Light Co.,* 115 U. S. 650, [29 L. Ed. 516, 6 Sup. Ct. Rep. 252, see, also, Rose's U. S. Notes]. In that case it appeared that the New Orleans Gas, Light and Banking Company, the predecessor in interest of the plaintiff, had obtained a franchise from the legislature of Louisiana by which it was given the sole and exclusive privilege of vending gas lights in the city of New Orleans and its faubourgs and the city of Lafayette to such persons or bodies corporate who may voluntarily choose to contract for the same. Subsequently the legislature gave another corporation the right to lay its mains and manufacture and sell gas in the city of New Orleans, and the action was brought to restrain it from so doing on the ground that the second franchise was a violation of the contract given to the first, wherein it was granted the exclusive privilege of manufacturing and selling gas in the territory. In the course of the decision it is said: ''It will, therefore, be assumed in the further consideration of this case, that the charter of the Crescent City Gas-Light Company—to whose rights and franchises the present plaintiff has succeeded—so far as it created a corporation with authority to manufacture gas and to distribute the same by

means of pipes, mains and conduits, laid in the streets and other public ways, of New Orleans, constituted, to use the language of this court in the case of the *Delaware Railroad Tax,* 18 Wall. 206, [21 L. Ed. 888], 'a contract between the state and its corporators, and within the provision of the constitution prohibiting legislation impairing the obligation of contracts,' and therefore 'equally protected from legislative interference, whether the public be interested in the exercise of its franchise, or the charter be granted for the sole benefit of its corporators.'

"But it is earnestly insisted that, as the supplying of New Orleans and its inhabitants with gas has relation to the public comfort, and, in some sense, to the public health and the public safety, and, for that reason, is an object to which the police power extends, it was not competent for one legislature to limit or restrict the power of a subsequent legislature in respect to these subjects. It is, consequently, claimed that the state may at pleasure recall the grant of exclusive privileges to the plaintiff; and that no agreement by her, upon whatever consideration, in reference to a matter connected in any degree with the public comfort, the public health or the public safety will constitute the obligation of which is protected against impairment by the national constitution. And this position is supposed by counsel to be justified by recent adjudications of this court in which the nature and scope of the police power has been considered.

"In the *Slaughter-House Cases,* 16 Wall. 36, 62, [21 L. Ed. 394], it was said that the police power is, from its nature, incapable of any exact definition or limitation; and, in *Stone* v. *Mississippi,* 101 U. S. 814, 818, [25 L. Ed. 1079], that it is 'easier to determine whether a particular case comes within the general scope of the power than to give an abstract definition of the power itself, which will be in all respects accurate.' That there is a power, sometimes called the police power, which has never been surrendered by the states, in virtue of which they may, within certain limits, control everything within their respective territories, and upon the proper exercise of which, under some circumstances, may depend the public health, the public morals, or the public safety, is conceded in all cases. In its broadest sense, as sometimes defined, it includes all legisla-

tion and almost every function of civil government. As thus defined, we may, not improperly, refer to that power the authority of the state to create educational and charitable institutions, and provide for the establishment, maintenance, and control of public highways, turnpike roads, canals, wharves, ferries, and telegraph lines, and the draining of swamps. Definitions of the police power must, however, be taken, subject to the condition that the state cannot, in its exercise, for any purpose whatever, encroach upon the powers of the general government, or rights granted or secured by the supreme law of the land."

In the same case it is said: "Yet, if the contract was within the scope of the authority conferred by the constitution of the state, it is, like any other contract made by competent authority, binding upon the parties. Nor can the people or their representatives, by an act of theirs afterward, impair its obligation. When the contract is made the constitution of the United States acts upon it and declares that it shall not be impaired and it makes it the duty of this court to carry it into execution."

The decision then cites numerous cases wherein the states have attempted to do things, the effect of which was to impair the obligations of contracts, by a supposed exercise of the police power, and wherein the supreme court of the United States, in every instance, held that that police power could not be used for such purpose.

The case is well worthy of a careful perusal by anyone interested in the principles involved.

[5] It is claimed that the plaintiff can obtain all the relief she may be entitled to without resorting to equity, but the decisions seem pretty generally to hold that injunction may be had to prevent the cutting down of growing trees. An entry upon land and digging up and removing fruit trees growing upon it, is waste and injury to the inheritance and are acts which a court of equity will enjoin. (*Silva* v. *Garcia,* 65 Cal. 591, [4 Pac. 628].)

In *Natoma Water & Min. Co.* v. *Clarkin,* 14 Cal. 544, it was said that "the cutting, destroying and removing of growing timber on the premises in controversy constituted, without other matter, sufficient ground for the issuance of the writ."

To the same effect are *United States* v. *Guglard,* 79 Fed. 23, and *Hicks* v. *Michael,* 15 Cal. 107. A threatened injury to real property in the nature of waste may be restrained. (*More* v. *Massini,* 32 Cal. 590; *Hatton* v. *Gregg,* 4 Cal. App. 542, [88 Pac. 594].)

We are of the opinion that the evidence did not justify the finding of the court that the trees were a public nuisance, nor the findings that pecuniary compensation would give the plaintiff all the relief to which she is entitled. On the facts disclosed by the record, the defendants have no right to cut down or destroy the trees.

The judgment is reversed.

Hart, J., and Burnett, J., concurred.

A petition to have the cause heard in the supreme court, after judgment in the district court of appeal, was denied by the supreme court on May 17, 1920.

All the Justices concurred.