No. 45,345

JULIUS D. SPEARS, SPEARS REALTY CO., INC., a Corporation, and WEST RIDING DEVELOPMENT CO., a Joint Venture, *Appellants,* v. KANSAS CITY POWER AND LIGHT CO., a Corporation, *Appellee.*

(455 P. 2d 496)

Opinion filed June 14, 1969.

*James C. Mordy,* of Kansas City, Missouri, argued the cause, and *Lyndus A. Henry,* of Overland Park, and *Martin J. Purcell,* of Kansas City, Missouri, were with him on the brief for the appellant.

*Jerome T. Wolfe,* of Kansas City, Missouri, argued the cause, and *H. Thomas Payne,* of Olathe, and *Lowell L. Smithson,* of Kansas City, Missouri, were with him on the brief for the appellee.

The opinion of the court was delivered by

FONTRON, J.: The plaintiffs, Julius D. Spears, Spears Realty Co., Inc., and West Riding Development Company, bring this action against the defendant, Kansas City Power and Light Company, to recover damages for an alleged appropriation of their land by means of the construction of underground transmission lines and conduits. Summary judgment was entered in the defendant's favor and the plaintiffs have appealed. For convenience we shall hereafter refer to the appellants as Spears or plaintiffs, and to the appellee as defendant or Company.

None of the facts required to determine the issue here presented are in dispute. In 1956 the Company instituted eminent domain proceedings to secure an easement in certain lands lying in that part of Johnson County which is now a part of Prairie Village. Included in the condemnation proceedings was a strip of land along the south line of a tract presently bounded by Roe and Nall Avenues, on the east and west, and by 87th Street and the Meadowbrook Golf and Country Club, on the north and south. This tract, which was owned at the time by Mr. and Mrs. Irwig, was acquired by Spears in 1960. It is not denied that Spears took title to the tract subject to the Company's easement acquired in the condemnation action.

In paragraph 3 of the petition filed in the condemnation proceedings, the Company alleged that it desired "to construct, operate and maintain a 161 Kv transmission line or lines, together with

necessary distribution lines," extending a distance of some 2¾ miles between two of its substations "for the purpose of more adequately serving present and future customers in the State of Kansas." Paragraph 4 of the same petition reads as follows:

"Petitioner desires to exercise the right of eminent domain as conferred upon it by Section 17-618 of General Statutes of Kansas, 1949, in the manner provided by Section 26-101 of General Statutes of Kansas, 1949, for the purpose of constructing, operating and maintaining said transmission line or lines as heretofore described, to acquire by condemnation, an easement or right-of-way *over, under, along and across* each of the hereinafter described tracts or parcels of land, for the purpose of transacting and conducting its said business, as aforesaid." (Emphasis supplied.)

No complaint is made by Spears as to the regularity of the eminent domain proceedings. The appraisers appointed by the court awarded the Irwigs $18,000 for the easement across their tract, and this award was appealed to district court, where the appeal was settled for $20,000.

Shortly after acquiring its easement, the Company constructed overhead electric transmission lines within its right of way, and in 1958 constructed certain underground installations. In 1966, the Company installed additional underground electric transmission lines within its right of way across the tract, which was then owned by Spears, and the construction of these later lines gave rise to this lawsuit. In view of the limited question before us in this appeal, the alleged character and extent of the underground installations, whenever they were constructed, are not of material consequence and need not be determined here.

Responding to the plaintiffs' petition, the Company filed an answer conceding its construction of underground electrical facilities within the right of way, both before and after Spears acquired title, and incorporating therein by reference the petition filed in the condemnation action. The Company also filed a verified motion for summary judgment admitting the underground installations and setting out by means of exhibits the entire eminent domain proceedings.

The Company's motion for summary judgment was thereafter sustained by the court pursuant to the following Memorandum Decision:

"1. The entire court file in Case No. 22791 is made a part hereof by reference.

"2. The petition, order appointing appraisers, publication notice and report of appraisers all refer to the easement for transmission lines—under, along—the land involved.

"3. The appraisers' report is controlling as to what is taken in a condemnation proceeding. It recites—in through, under and across the lands described in the petition.

Sutton Vs. Frazier, 183 Kansas 33.

Roberts, *et al.* Vs. Upper Verdigris Water District,
No. 24, 193 Kansas 151.

"The court finds and decrees that the defendant acquired, by condemnation in Case No. 22791, the right to construct, operate, and maintain underground electric transmission lines in its easement across the land described in plaintiffs' petition prior to the plaintiffs acquiring any interest therein.

"The motion for summary judgment is sustained.

"Costs are taxed against the plaintiffs.

"Dated December 12th, 1967.

/s/ Clayton Brenner
Judge, Division No. 2."

As previously stated, the plaintiffs appealed from the summary judgment entered against them and the issue raised by them on appeal is presented in this concise statement found in their brief:

"The sole question in this case is whether or not defendant power company acquired the right to install an underground conduit by virtue of the easement which it acquired in the 1956 condemnation action."

Following the phrasing of the question, the plaintiffs' contentions are succinctly summarized:

"Appellant contends: (1) there was no statutory authority by which defendant power company could have acquired by condemnation any right to construct an underground conduit, and (2) even if such statutory authority existed, the purpose and effect of the 1956 condemnation action was to acquire a right-of-way for a 161,000 volt transmission line and defendant power company thereby acquired no right to construct underground conduits."

A conduit is a pipe, tube or tile for receiving and protecting electric wires or cables. (Webster's Third International Dictionary, Unabridged; *Wofford Heights Associates v. County of Kern,* 219 C. A. 2d 34, 32 Cal. Rptr. 870.) The connotation of the word "conduit" presupposes a cable or wires for the transmission of electric power, and we consider the term as being used co-extensively with electric lines throughout these proceedings.

Proceeding to the first point, Spears suggests that under Kansas statutes an electric power company is not authorized to acquire property by condemnation for the purpose of constructing underground transmission lines or conduits. This contention must be rejected.

Under the provisions of K. S. A. 17-618 various corporations affected with a public interest are empowered to exercise the right of eminent domain. By the very terms of the act, electric companies are included among those so favored. In *Cline v. Kansas Gas and Electric Company*, 260 F. 2d 271, the United States Court of Appeals, 10th Circuit, held that an electric utility company came expressly within the act and was empowered to obtain a right of way by eminent domain for the construction of its electric line.

Although the statute may never serve as a model for clarity of expression, nonetheless we believe it furnishes authority for the acquisition by a public utility company engaged in producing electricity, to acquire an underground easement for the purpose of installing underground lines. As we read K. S. A. 17-618, using a kaleidoscopic process, it authorizes a corporation such as the defendant, which desires to transmit power by electrical current, to obtain a right of way by condemnation for the purpose of laying its wires "on, *through*, or over any land or lot." (Emphasis supplied.) The term "through," in our opinion, is used in the sense of and is equivalent to "under."

If an electric power company is authorized by statute to install underground wires through property in which it has an easement, we believe that by natural intendment of the law it may insulate and protect its wires by conduit or otherwise to the extent required for rendering service to its customers. Although statutes which confer rights to exercise the power of eminent domain are to be strictly construed, this doctrine does not preclude the reasonable and sound construction thereof in the light of the purposes and objectives sought to be obtained by its enactment. (29A C. J. S., Eminent Domain, § 22, pp. 220, 221.)

We now turn to plaintiffs' second contention on which, according to their counsel, reliance is chiefly placed. Put briefly, the argument is that the only right acquired by the Company in the 1956 condemnation action was to construct overhead wires or lines above the right of way, not underground lines beneath the surface. The trial court rejected this construction of the eminent domain proceedings. We believe it was correct in so doing.

In its decision, the trial court said that the report of the appraisers controls what is taken in a condemnation action. This conclusion is supported by our cases. In *Sutton v. Frazier*, 183 Kan. 33, 325 P. 2d 338, we held that where land was taken under eminent domain

for the purpose of constructing and operating a sewage disposal plant, the condemner, an improvement district, acquired no title to the minerals underlying the land condemned. Paragraph 8 of the syllabus reads:

"In an eminent domain proceeding the report of the appraisers must show what is taken, and what the landowners part with. Nothing is taken by implication or intendment, and the landowners may rely implicitly on the report filed which becomes the evidence and the only evidence of the commissioners' doings."

The *Sutton* case was followed in *Roberts v. Upper Verdigris Watershed,* 193 Kan. 151, 392 P. 2d 914, where an easement was taken for the impounding, permanent storage and temporary detention of waters. In considering what use of the easement was acquired by the condemner this court held:

"In a condemnation proceeding instituted under the provisions of G. S. 1949, 24-438 *et seq.,* and amendments thereto, the commissioners' report becomes the evidence and the only evidence of the extent of the easement taken and the extent of its use.

"The extent of the easement taken in the condemnation proceeding and the extent of its use is to be determined as a matter of law from the language used in the commissioners' report." (Syl. ¶¶ 1, 2.)

For an earlier case to like effect, see *Mercantile Co. v. O. H. & G. Rld. Co.,* 56 Kan. 174, 42 Pac. 712, in which the subject is discussed and prior decisions are cited.

The appraisers report in the present action is fully set out in the record. In the report, which is verified, the appraisers state they were appointed to appraise the lands taken and assess the damages done to owners, tenants, etc., by reason of the condemnation of "right-of-way easements for the construction, operation and maintenance of electric transmission line or *lines* and the construction thereof, as more particularly described in the petition filed with the Clerk of said Court, *in, through, under and across* the hereinafter designated tracts and parcels of land in Johnson County, Kansas, more particularly described in said petition, . . ." (Emphasis supplied.) The report thereafter lists each tract separately, together with the amount of damages awarded. The report also incorporates by reference the notice given landowners by mail and by publication.

At this point it is appropriate to mention that the order appointing appraisers shows their appointment to view and appraise the value of the easements taken *through, under and across* each of the tracts and to assess the damage done to the owners, etc. The notice given

by the appraisers, both by publication and by individual mailing, likewise reflects their appointment to view, appraise and assess damages by reason of the condemnation of right of way easements to construct, operate and maintain electric transmission and distribution lines *in, through, under and across* the several described tracts of land.

After thoroughly considering the appraisers' report, corroborated as it is by the order appointing the appraisers and by the appraisers' notice of their appointment, we feel bound to conclude that the Company, through the 1956 condemnation proceedings, acquired an easement not only for the erection of overhead transmission lines, but for underground lines as well. There is no ambiguity as to the extent of the easement taken. It is explicitly described in each instrument as through, under and across the several properties.

We are well aware of plaintiffs' argument that the sole and only purpose of the condemnation suit was to obtain an easement for the construction of overhead lines. In this connection, they point out two maps attached to the petition in that case, the first purporting to show the proposed route of "161 Kv Transmission Line", and the second tracing the route across the Irwig property. We discern nothing in either map which suggests the design of or the manner in which the line or lines are to be constructed or which negatives in any way the condemner's intention, openly expressed in its petition, to acquire an easement in, *under, through* and across the Irwig and other tracts. Moreover the maps, even had they revealed the nature, design and manner of the construction contemplated, were not made a part of the appraisers' report. (*Roberts v. Upper Verdigris Watershed,* supra, p. 158.)

Spears also points to language found in the condemnation petition which refers to towers, poles, wires, anchors and *appurtenances.* The reference relates to the condemner's rights of ingress and egress to the right of way to erect, construct, maintain, inspect, rebuild and repair its transmission and distribution lines, and to replace, renew and relocate steel towers, poles, wires, anchors and appurtenances thereto "upon, across, over, *under* or along said right-of-way." (Emphasis supplied.) The petition does not define "appurtenances" nor does it attempt to limit what may be erected upon, across, over, *under* or along the right of way. The reference can not be said to negate the acquisition of sub-surface easement rights, even by implication, when the adverb "under" has been specifically

included. Nor do provisions in the condemnation petition which relate to the cutting of trees upon the right of way, and prohibit the erection of permanent structures under transmission lines have the significance attributed to them by Spears; neither provision is inconsistent with the condemner's obtaining the right to construct its lines both underground and overhead.

Thus we discover nothing, either in the appraisers' report, which is the controlling document, or in other papers filed in the condemnation action, which is inconsistent with the right claimed by the Company to install underground power lines or conduits within the boundaries of its easement. The prevailing rule is that an easement or a servitude imposed upon another's land extends to all uses directly or indirectly conducive to advance the purposes for which it was obtained. (26 Am. Jur. 2d, Eminent Domain, § 133, p. 794.) As it applies specifically to power lines, the rule is stated in 30 C. J. S., Eminent Domain, § 451, pp. 644, 645, in this fashion:

"*Power Lines.* An easement obtained by condemnation of a right of way for a power line extends to all uses directly or incidentally conducive to the advancement of the purposes for which the right of way was acquired, including the right to erect, maintain, and service underground wires. . . ."

As the rule is applied to the taking of lands for railroad purposes and for highway purposes, we find it exemplified in the cases of *Hennick v. Kansas City Southern Ry. Co.,* 364 Mo. 883, 269 S. W. 2d 646 and *S. C. State Hwy. Dept. v. Butterfield et ux.,* 216 S. C. 463, 58 S. E. 2d 737, respectively.

In *Aycock v. Houston Lighting & Power Co.,* 175 S. W. 2d 710 (Tex.), which was an eminent domain proceeding to condemn an easement for the construction of lines to transmit and distribute electric current, the Texas appellate court ruled that the trial court did not err in adjudging the power company, as part of its easement, had acquired the right to erect, maintain and service underground wires.

This court has recently said in *Soden v. State Highway Commission,* 192 Kan. 241, 387 P. 2d 182; *Reinecker v. Board of Trustees,* 198 Kan. 715, 426 P. 2d 44 and *Shelor v. Western Power & Gas Co.,* 202 Kan. 428, 449 P. 2d 591, that in determining the extent of land needed for legitimate public purposes, it is proper to consider future demands which may reasonably be anticipated. These holdings mirror the generally accepted view that land condemned in the public interest is taken for such present and prospective uses as are

consistent with the purpose for which the land is appropriated. (*S. C. State Hwy. Dept. v. Butterfield et ux.,* supra; *Hennick v. Kansas City Southern Ry. Co.,* supra.)

At the time it instituted proceedings to obtain a right of way for the transmission of electric power, the Company could reasonably expect that demand for its product would grow, requiring additional transmission lines and facilities. Recognition of this contingency is reflected in the condemnation petition where the Company alleged that its contemplated construction of the transmission line or lines was for the purpose of more adequately serving present and future needs of its Kansas customers. This was a legitimate consideration in acquiring an easement over, *under* and across the plaintiffs' tract.

Having once concluded that the Company, through the 1956 eminent domain proceedings, acquired the right to use its easement for the construction of underground lines as well as for lines overhead, we are constrained also to hold the trial court did not err in rendering summary judgment in the Company's favor. In this connection we have not failed to note the plaintiffs' argument that they had not completed their discovery at the time summary judgment was entered. However, we consider their contention unavailing.

It is true we said in *Brick v. City of Wichita,* 195 Kan. 206, 403 P. 2d 964, that ordinarily motions for summary judgment should not be sustained so long as pretrial discovery remains unfinished. But we also said in *Brick,* and we have consistently held in other cases, that K. S. A. 60-256 authorizes the entry of summary judgment if the pleadings, depositions, answers to interrogatories and affidavits, if any, show there is no *genuine* issue as to any *material* fact. (*Evans v. Lynch,* 200 Kan. 331, 436 P. 2d 867; *West v. Prairie State Bank,* 200 Kan. 263, 436 P. 2d 402.)

For the most part our cases in this area have dealt with situations where depositions have been taken, interrogatories answered, affidavits filed, etc. But we have also recognized that summary judgment may be granted upon the pleadings alone, where only a question of law remains. This was the problem confronting us in *In re Estate of Mullin,* 201 Kan. 756, 443 P. 2d 331, where we said:

"The purpose of summary judgment is to make possible the expeditious disposition of cases in which there are no genuine issues of material fact upon which the outcome of the litigation depends. In determining whether a motion for summary judgment is well founded, the court may pierce formal allegations

of fact in pleadings and determine from the entire case whether there are genuine issues of fact to be resolved at a formal trial. . . ." (p. 761.)

In the instant case we must appraise the propriety of entering summary judgment against Spears in the context of the pleadings, including the summary judgment motion which set out the entire eminent domain proceedings, together with the nature and character of the evidence which Spears proposed to obtain. The only pleadings of record are the plaintiffs' petition, the defendant's answer, and the Company's motion for summary judgment. All three pleadings incorporate the petition in the condemnation action.

The plaintiffs now say they offered to make available to the court the plans for constructing the underground conduit as to size and as to location *vis-à-vis* their own sewer lines. Even were this offer made of record, the evidence would have been irrelevant to the issue before us on appeal. Neither are we persuaded that the nature and extent of the underground cables installed in 1958 would be of any moment on the limited issue formulated in plaintiffs' brief conformably with their statement of points.

We are fully cognizant of the authorities which formulate the rule that the use made of an easement must not only be germane to the purposes for which the easement was acquired but that it must be a reasonable use, as well. (*Aycock v. Houston Lighting & Power Co.*, supra; *Jenkins v. Depoyster,* 299 Ky. 500, 186 S. W. 2d 14.) But the reasonableness of the defendant's use of the easement has not been made an issue in this lawsuit; the issue is confined to whether the Company's use was an authorized use. Consequently, evidence as to whether the Company has used its authority to construct underground lines in a reasonable and justifiable fashion has no bearing on any material issue raised herein.

We emphasize: the issue we are called upon to decide is whether the Company acquired the right to install an underground line or conduit by virtue of the easement obtained in the condemnation action; that is, whether such use of its easement was an authorized use. The answer depends, as a matter of law, upon the extent of the easement and extent of the use shown by the language in the appraisers' report. (*Roberts v. Upper Verdigris Watershed,* supra.) The extent of the use in this case, as clearly shown by the report, is to construct, operate and maintain electric transmission line or lines in, through, *under* and across the lands involved.

We are not to be understood as saying that a condemner may

make an unlimited or unreasonable use of an easement it has acquired, or that he may burden a servitude imposed on a condemnee's land in disregard of latter's correlative rights. That kind of a situation does not confront us in this case. The issue framed by the pleadings was not the reasonableness of the Company's use of the easement but whether the company was authorized to use the easement for laying underground lines. This has been the issue throughout the course of this action, not only in this court but before the trial court as well, and our decision is confined thereto.

The judgment of the district court is affirmed.

SCHROEDER, J., dissenting: In my opinion the court has placed undue emphasis upon the report of the appraisers and has failed to give proper consideration to the petition in the condemnation action. The petition is the jurisdictional instrument upon which a condemnation proceeding is conducted. What the court has actually done is to give the condemning authority rights it did not acquire by the original condemnation proceedings.

At the outset it is conceded the defendant (Kansas City Power and Light Company—appellee) had statutory authority to acquire by condemnation a right to construct underground transmission lines encased in proper insulation or conduit to transmit electricity across the plaintiffs' land in accordance with the best practices in the industry. On the facts in this case, however, the question is whether they acquired such right.

The court's decision is based upon the proposition that in eminent domain proceedings the report of the appraisers becomes the evidence and the only evidence of the extent of the easement taken and the extent of its use. The court further holds the extent of an easement taken in condemnation proceedings and the extent of its use are to be determined as a matter of law from the language used in the appraisers' report. In support thereof the court cites Sutton v. Frazier, 183 Kan. 33, 325 P. 2d 338; and Roberts v. Upper Verdigris Watershed, 193 Kan. 151, 392 P. 2d 914, which followed the Sutton case.

The situation there presented is different from the one with which the court is here confronted. In Sutton the question was whether the condemning authority (the Sunflower Improvement District) acquired the fee title to property under a statute authorizing it to construct and operate a sewage disposal plant, and it was

held the minerals underlying the land condemned were not acquired by the eminent domain proceeding—no authority having been granted by the empowering statute to do so, and the report of the appraisers did not purport to cover the minerals underlying the land.

In the *Roberts* case an easement was taken for the purpose of impounding waters, both permanent storage and temporary detention. Occasionally the entire property within the easement would be covered with flood waters, but when it was not covered with such flood waters, the landowner was permitted to use the portion of the land within the easement which was not inundated with water. The landowner contended and presented his evidence to the jury on the ground that the condemning authority would make full use of a permanent easement covering the sixty acres condemned and damages to the remaining acreage. The condemning authority contended it was taking only a restricted use of the land condemned, thereby seeking to avoid the payment of compensation and damages based on the full use of a permanent easement.

In the instant case the situation is the reverse of *Roberts*. The condemning authority has already acquired what rights it may have by an eminent domain proceeding, and it now contends it has the unlimited use of its right-of-way to construct underground electrical transmission lines. The question is whether this is more than it has acquired and paid for in the eminent domain proceedings.

The problem here confronting the court is one frequently encountered in condemnation matters. That is, when the condemning authority is in the process of acquiring its rights to property, it seeks to pay as little as possible for the rights acquired and plays down the extent of the damages the landowner may suffer, both present and future. On the other hand, after the condemning authority has acquired its rights in the property it asserts full rights and unlimited uses, as in the instant case. This matter has been the subject of much litigation in the courts of this country.

In all condemnation proceedings the petition is the jurisdictional instrument upon which the condemnation matter proceeds. It follows that the appraisers' report must be considered in connection with the petition pursuant to which the appraisers acted and received their instructions.

The purpose of the easement which the defendant acquired in its 1956 condemnation action was to permit the construction of a 161,000 volt electric transmission line or lines, and not to acquire

an easement for any underground electrical conduits. It is clear that any ambiguity in the scope of the easement taken in the 1956 condemnation action must be resolved against the defendant power company. An easement taken by condemnation cannot be extended by implication or intendment. (*State v. Armell,* 8 Kan. 288; *Mercantile Co. v. O. H. & G. Rld. Co.,* 56 Kan. 174, 42 Pac. 712; and *Sutton v. Frazier,* supra.)

The caption of the 1956 condemnation action clearly showed that an easement was sought to be taken only for the construction of electrical transmission lines and distribution lines above ground. The caption of the petition filed by the power company described the proceeding as follows:

"In the matter of the Application of Kansas City Power & Light Company, a corporation, for exercise of the right of eminent domain and for the appointment of appraisers to appraise and assess damages by reason of the Condemnation of a right-of-way *over* certain real estate as herein described." (Emphasis added.)

Under the general condemnation statute in force in 1956 (G. S. 1949 [now K. S. A.] 26-101) any corporation having the power of eminent domain which desired "to acquire land for a lawful purpose" was required to present to the district court a petition "setting forth the purpose for which the land is sought to be acquired."

In accordance with this requirement, the defendant power company set forth the purpose for which it sought to acquire the easement over the plaintiffs' land, in paragraph 4 of its petition in the 1956 condemnation action, as follows:

"Petitioner desires to exercise the right of eminent domain . . . *for the purpose of constructing, operating and maintaining said transmission line or lines as heretofore described,* to acquire by condemnation, an easement or right-of-way over, under, along and across each of the hereinafter described tracts or parcels of land, for the purpose of transacting and conducting its said business, as aforesaid." (Emphasis added.)

The defendant power company had specifically described the said transmission line or lines for which it sought to acquire an easement in paragraph 3 of its petition, wherein it stated:

"Petitioner further states that it desires to construct, operate and maintain a 161 Kv transmission line or lines, together with necessary distribution lines, extending from Substation No. 101 . . . to Petitioner's new Substation No. 91 . . . along the route as more definitely set out on the map hereto attached marked Exhibit I and made a part hereof by reference, . . ."

The map referred to in paragraph 3, and attached to the petition as Exhibit I, was captioned:

"161 KV. TRANSMISSION LINE—INDEX MAP
SUB 101 TO SUB 91 TO SUB 108"

The foregoing specifically shows that the defendant power company intended to condemn an easement for the purpose of constructing a 161,000 volt transmission line or lines, together with necessary distribution lines between two of its substations.

The court consistently emphasizes the expression "over, under, along and across," as used above in the statement of purpose in the petition, but fails to give due consideration to paragraph 7 appearing in the petition, which reads:

"*In acquiring said right of way easements for the construction, operation and maintenance of its towers, poles, wires and other facilities for said transmission and distribution lines,* in, through, under, and across said tracts and parcels of land described in the preceding paragraph, *the rights that the petitioner may exercise and the rights reserved to the owners, tenants, lienholders and easement holders are as follows,* to-wit:

"Petitioner, its successors and assigns, shall have the right of ingress and egress to and from said transmission and distribution line right-of-way to survey, erect, construct, maintain, inspect, patrol, rebuild and repair said lines, together with the right to replace, renew and relocate upon, across, over, under or along said right-of-way *steel towers, poles, wires, anchors and appurtenances thereto and the right to remove at any time any or all of said installations or appurtenances,* and petitioner may erect, maintain and use gates in all fences which cross or which shall hereafter cross the route of said transmission and distribution lines, and *may trim and/or cut and clear away any trees, limbs and brush upon or adjacent to said right-of-way whenever in its judgment the same will interfere with or endanger the construction, operation or maintenance of said lines.* In exercising its rights of ingress and egress, petitioner shall, whenever practicable, use existing roads or lanes and shall repair any damage by its use thereof, but if petitioner finds it impractical to use existing roads or lanes during construction or for maintenance or repair of its transmission and distribution lines, petitioner shall have the right to come upon said right-of-way through adjoining lands of the owners, tenants, lienholders and easement holders, petitioner to repair any damage by its use thereof. *If the petitioner shall cut or remove trees under the rights hereby taken, if such trees shall be valuable for either timber or wood, they shall continue to be the property of the owners,* tenants, lienholders and easement holders, but all tops, limbs and brush shall be burned or removed by the petitioner.

"*The owners,* tenants, lienholders and easement holders, their heirs or assigns, may cultivate and fully use and enjoy the land within said easement or right-of-way, provided the same shall not be used in any way that will interfere with or endanger the construction, operation or maintenance of *said transmission and distribution lines* and provided that no permanent structures shall be erected or maintained *under said transmission or distribution lines.*

"Petitioner, its successors or assigns, agrees to pay for any reasonable permanent damage caused to land, growing crops, fences, livestock, machinery, or

other personal property of the owners, tenants, lienholders and easement holders, from the construction, operation or maintenance of said transmission lines." (Emphasis added.)

The above portions of paragraph 7 emphasized indicate that the initial clause in paragraph 7 referred only to "towers, poles, wires and other facilities." The next clause in the paragraph referred only to "steel towers, poles, wires, anchors and appurtenances thereto." There is not the slightest indication anywhere in this paragraph that the petitioner intended to acquire any rights for underground conduits, cables, ducts, mains, pipes, tubes or any similar terms descriptive of any underground transmission facilities.

The intermittent use of the preposition "under" at scattered places in the petition is in itself ambiguous in view of the fact that the erection of steel towers requires a concrete foundation extending beneath the surface of the soil.

The next clause in paragraph 7 refers to the right to trim, cut and clear away any trees, limbs and brush which might interfere with the construction, operation or maintenance of "said lines." Obviously, this pertains only to overhead transmission lines.

There is no mention in the petition of any right to remove roots, stumps, rocks, topsoil, overburden, drainage pipes, culverts, manholes, streets, curbs, retaining walls, or any other possible surface or subsurface obstructions. Likewise, there is no provision giving the defendant power company the right to excavate, dig any ditches or trenches, do any grading, make any cuts or fills, etc.

An important subparagraph in paragraph 7 is the one reserving certain rights to the owners of the tracts across which the power company sought to condemn the easement.

In this paragraph the "said transmission and distribution lines" are the 161,000 volt electrical transmission line or lines, together with necessary distribution lines that are the subject of the petition. When the landowners are told in this subparagraph that they can fully use and enjoy the land within the easement or right-of-way provided that no permanent structures shall be erected or maintained "under said transmission or distribution lines," they are clearly told in the petition these transmission and distribution lines will be above the surface of the land. On this point it is to be noted there was no limitation or restriction against the erection of a structure over said transmission or distribution lines which would indicate that the petition did not contemplate the construction of an

underground conduit for the transmission of electricity. The petition clearly contemplated only the construction of overhead transmission or distribution lines *under* which the owners' right to erect structures was prohibited.

If the defendant power company intended to exercise its authority to condemn an easement for the underground transmission of electricity, the limitations upon the owners' rights would have been much broader. For example, there was no limitation upon the owners' right to place streets, driveways, curbs or sidewalks across the surface of said easement, or to run sewers, water lines, gas lines, electrical conduits or other underground pipes or tunnels across the right-of-way condemned. None of the surface or subsurface facilities enumerated would be prohibited by the restriction against erecting structures under said transmission or distribution lines. Nevertheless, once the defendant power company constructed an underground system of electrical transmission lines, as it did in 1966, discussed *infra,* there was no way that anyone could run any such utility or service lines through the concrete conduit forming a barricade.

In my opinion the condemnation petition filed in 1956 by the defendant power company was insufficient to acquire the right to construct underground electrical transmission lines as the power company did in 1966 in the right-of-way condemned. Assuming, however, that the word "under" sporadically used in the 1956 condemnation petition purported to grant such right as held by the court, the entire petition as heretofore analyzed is at least ambiguous as to whether such right was acquired. In this situation the petition must be construed against the defendant power company on the basis of the authorities heretofore cited.

Construing the petition then in favor of the landowner, the condemning authority did not allege in its petition that it was taking an easement for the construction of underground electrical transmission or distribution lines. It follows the report of the appraisers, if it be construed to give more than the right to construct, operate and maintain overhead lines, exceeded the authority of the petition and is not controlling on the plaintiffs. The appraisers' report, however, is not subject to such construction. With respect to the electrical transmission lines the appraisers' report refers to them "as more particularly described in the petition."

What are the facts which the court in this case found to be

immaterial on the issue presented? The court was informed on the argument of this case that the defendant power company laid twelve underground electrical transmission conduit lines in concrete; that these lines were placed side by side in two's running parallel on the same horizontal plane approximately one foot apart; and that the pairs were stacked vertically on top of each other six high. These conduit lines were then encased in concrete which measured eighteen inches wide and four feet high, making a solid concrete wall across the plaintiffs' property, the top of which was to be constructed beneath the surface two and one-half feet, thereby making it impossible to install sewer and various utility lines across the easement. It was further related that by negotiation between the contractors the landowners paid $18,005 to have the defendant lower this installation two feet more than had been planned prior to its installation. In the petition herein the plaintiffs request reimbursement of the $18,000 and $100,000 damages for appropriation of an underground easement.

This property is located in Johnson County in a rapidly developing area, and the development of the plaintiffs' property for urban purposes was seriously jeopardized.

Assuming these facts to be true, were they before the appraisers when the condemnation matter was originally determined, or, if the matter was before a jury to determine just compensation to the landowners, were these facts disclosed so it could properly assess the damages?

If the defendant is permitted to construct an underground concrete wall as heretofore related on the right-of-way condemned, there is nothing which would prevent the defendant from constructing a concrete wall two feet wide commencing twenty feet beneath the surface of the land and extending above the surface in such a way as to constitute a Berlin Wall across the premises in question.

The court in its opinion circumvents the facts by saying "the evidence would have been irrelevant to the issue before us on appeal." (p. 529.) By this the court means the plaintiffs did not raise on appeal an issue as to the reasonable use of the easement condemned. The court fully recognizes authorities which formulate the rule that the use made of an easement must not only be germane to the purposes for which the easement was acquired, but that it must be a reasonable use as well. Therefore, in the opinion of the

court, the decision of the trial court in the instant case might well have been reversed had the plaintiffs raised this issue.

Actually, the authorities cited by the court for this proposition do not apply to the facts here. In my opinion they do not support the rule espoused by the court. In *Aycock v. Houston Lighting & Power Co.*, 175 S. W. 2d 710 (Tex. 1943), the electric company sought to construct a fence along its right-of-way condemned and keep the landowner off or keep him from using the land on the right-of-way. This was held not only to be unreasonable, but that the power company did not acquire the right to fence the easement condemned. The court said companies possessing the right to condemn private property for a public use cannot do what they please with the land condemned, but that they may do what is reasonably needful to carry out the purpose for which the land is taken.

In *Jenkins v. Depoyster*, 299 Ky. 500, 186 S. W. 2d 14, the grantee of minerals in land became involved with the owner as to surface rights. The court held the grantee of the minerals by implication of law acquired the right to use so much of the surface as may be reasonably necessary for beneficial and profitable working of the coal mine, including the right of ingress and egress to the extent that it is reasonably necessary for the use of the estate granted. It further held the owner of the servient estate could erect and maintain gates across the passageway to the property provided they are located and erected not to interfere unreasonably with the right of passage.

Here the court is not confronted with an easement created by contract which has been termed a vested expansible easement, wherein the expansion should be limited to what would be considered reasonable in amount or distance. In *Waggle v. Peoples Natural Gas Co.*, 17 Pa. D. & C. 2d 550 (1958), the court held the right in such easement ceased to be transitory when the original installation was completed.

For the rule where a blanket form of easement to erect an electric transmission line by contract is granted, see *Jackson Electric &c. Corp. v. Echols*, 84 Ga. App. 610, 66 S. E. 2d 770.

In my opinion on the facts in this case there is no distinction between an unreasonable use of the easement acquired by the defendant power company by condemnation and an unauthorized use of the easement. If it was unreasonable to construct an underground concrete barrier along the right-of-way it was unauthorized,

and on this basis the decision of the trial court should have been reversed.

The basis of my dissent herein, however, is more fundamental. It is based upon the petition filed in the instant case which is the jurisdictional instrument upon which the condemnation proceeding was conducted. As heretofore stated, the petition authorized only the taking of an easement for the construction, operation and maintenance of overhead transmission and distribution lines. The overhead line was constructed, operated and maintained for ten years before the defendant power company began construction of the underground lines here in controversy.

Nowhere in the record is it disclosed that the underground lines installed in the year 1958 were known to be in existence on the right-of-way condemned when the present plaintiffs acquired the property in question, and it cannot be said they were bound by the existence of these underground transmission lines by notice of the original condemnation proceedings on file in the office of the clerk of the district court.

It is time the Kansas Supreme Court spell out with some certainty what is required in a condemnation petition. Other jurisdictions have been confronted by similar situations and require the purposes for which an easement is taken for the transmission of electricity to be specifically described in detail.

For example, in the case of *In Matter of Long Island Lighting Co. (Wicks)*, 272 App. Div. 915, 71 N. Y. S. 2d 12, a property owner challenged the sufficiency of a petition, and the Appellate Division of the Supreme Court of New York reversed an order granting an easement and right-of-way in, over and across lands owned by the plaintiffs, stating:

". . . Appellant is entitled to know with reasonable certainty from an examination of the petition the height and size of the poles to be installed, their approximate location on the property, the number, location and size of the cross arms, and the extent to which they will be used for the purposes designated in the petition, the extent to which overhead and underground facilities will be employed, and such other information as will permit an accurate admeasurement of damages and control the future use of the property. (*Suffolk County Telephone Co. v. Gammon*, 113 App. Div. 764; *Bell Telephone Co. v. Parker*, 187 N. Y. 299.) . . ." (p. 915.)

In *Power Co. v. Shackelford*, 137 W. Va. 441, 73 S. E. 2d 809, an easement for the construction and operation of an electric transmis-

sion line was condemned, and the award of the commissioners was reversed and set aside, the court saying:

" 'In condemnation proceedings where land is sought to be taken, the plaintiff must describe it with accuracy and certainty. See 29 C. J. S., Eminent Domain, § 259, pages 1228 et seq. And this is the purport of subsection 5 of section 8220, supra. We cannot see why the same certainty and accuracy are not essential where an easement rather than the land itself is sought in the proceedings. And the authorities so hold. The reasons for this requirement of certainty and accuracy are not far to seek. They are essential so that both the owner of the easement and the owner of the property subjected to it may know exactly what their rights are with respect to their different interests. And certainty is just as essential in order to determine the value of the interests taken and the damage done by its taking to that portion of the property not subject to the easement. See, C. J. S., Eminent Domain, § 259, pages 1230, et seq.' . . ." (p. 448.)

In *Bell Telephone Co. v. Parker*, 187 N. Y. 299, 79 N. E. 1008, the court said:

"I think the description of the property sought to be condemned in this proceeding complies with the requirements of the statute in all respects save one; but that it is not sufficiently specific in stating the extent of the right which the petitioner desires to acquire 'to trim such trees as may be necessary to protect said line from interference.' " (p. 303.)

The landowners of this state and companies authorized to condemn private property to acquire an easement or right-of-way for the transmission of electric power are entitled to a statement of the law from this court as to what shall definitely be stated in a condemnation petition. It should require the petition to state in definite and certain language that which is taken and the uses to which the property taken will be put, both at the time of condemnation and in the future, so that no question may arise, as here, concerning the extent of the condemner's rights and the rights retained by the landowners in accordance with the authorities cited from other jurisdictions for the reasons stated therein.

In the instant case the defendant shortly after acquiring its easement by condemnation erected overhead transmission and distribution lines on high poles so that the lines were far above the surface of the land. This was pursuant to the stated purpose for which it acquired the easement at the time of condemnation. This is consistent with my construction of the petition herein.

It must be conceded the defendant herein, having the power of eminent domain, has the right to condemn property for future uses as well as uses contemplated at the time of condemnation, but if

such future uses are to go beyond the present needs of the condemning authority to construct, operate and maintain its transmission and distribution lines, such future use to which the property will be put must also be specifically stated and described in the condemnation petition.

It is respectfully submitted the judgment of the lower court should be reversed.

FROMME, J., joins in the foregoing dissent.

FATZER, J., dissenting: In my opinion, this case should be reversed with directions to proceed to trial upon the plaintiffs' petition for damages.

There was no statutory authority by which the defendant could acquire any right of eminent domain to construct an underground conduit. The court correctly observes the statute (K. S. A. 17-618) is ambiguous, but its language authorizes an electric company to exercise the power of eminent domain only to the extent that its *"wires may be laid, carried or stretched on, through or over any land or lot . . . as may be needed . . ."* (Emphasis supplied.) The court construes the statute and virtually, in one short sentence disposes of the case. In construing the statute, it states "[t]he term 'through' in our opinion, is used in the sense of and equivalent to 'under,'" and, therefore, holds the defendant acquired the right to construct a conduit "under" the surface of the plaintiffs' land. No authority is cited in support of that sweeping conclusion. My research discloses there is no authority to support the statement and the decided cases on the point are contrary to the court's holding.

The power of eminent domain can be exerted only by virtue of legislation *expressly* authorizing its exercise, and there is nothing in the statute which indicates an intention to authorize an electric company to condemn a right of way to "lay, carry or stretch" its wires in an underground conduit. The words "on" and "over," as used in the statute, clearly do not authorize the acquiring of any such right. The word "on" can only refer to the surface of land. The word "over" was used in its ordinary sense to mean above the surface of the land. Thus, the only other empowering word remaining in the statute for consideration is the word "through." The

word "through" is defined in Webster's Third New International Dictionary Unabridged, as:

"Extending or passing from one end or surface to another . . . admitting free or continuous passage . . . not interrupted or obstructed . . . affording right of way . . ."

Like many words in the English language, the word "through" has various meanings and its significance in a particular case is dependent on the thought with which it is used and the context in which it is employed. (86 C. J. S., Through, p. 813.) The word is a very common preposition and its primary and ordinary meaning is from end to end; from side to side; from one surface or limit to the other surface or limit, and as meaning onward from point to point, or into or out of at the opposite, or at another point. As employed as an adjective and when used with respect to transportation, it means extending or going from point of departure to destination, and has been held to merely describe the line or direction of the route. When used as an adverb, it may be employed as meaning throughout; from beginning to end; to the ultimate purpose. (62 C. J., Through, p. 949.) As used in 17-618, the word "through" should be construed to be synonymous with "in," "over" and "across" as merely describing the line or direction by which an easement passes "through" land or lots. The phrase "over and through" has been held not to include "under," "below" or "beneath." In *Commonwealth v. Warwick*, 185 Pa. 623, 40 A. 93, a telephone company contended it had the right to lay its lines in underground conduits pursuant to an ordinance by which it was "authorized to run and maintain its wires over and through the streets of the city of Philadelphia for the purpose of establishing telephonic communication between its patrons and between its exchange office and the subscribers thereto . . ." It was held the company acquired no such right, and the Supreme Court of Pennsylvania said:

"The grant however of authority *to run and maintain wires 'over and through' the streets, did not include permission to lay them under, below or beneath. Over and through are equivalent to across and along,* not only by the natural meaning of the words in this connection, but by the practical construction given to them at the time of the acts of the parties. The claims of the realtor in this respect are too broad and cannot be sustained." (1. c. 637.) (Emphasis supplied.)

The foregoing construction of the statute is sustained in *Strain v. Cities Service Gas Co.*, 148 Kan. 393, 83 P. 2d 124. There, the gas company sought to take by condemnation subterranean sands

of the plaintiffs' land for a gas storage reservoir. This court said no statutory authority existed to condemn subterranean earth to store natural gas. The words of the statute empowering the exercise of eminent domain of "on, through or over any land" were expressly considered in the opinion, and in denying the right, the court said:

". . . If the rights contended for by appellant are to be given to gas pipeline companies, it is a matter for the consideration of the legislature. To stretch the statute to cover the case here presented would be little short of judicial legislation." (l. c. 397.)

It is well settled that an easement taken by condemnation cannot be extended by implication or intendiment. Any ambiguity in the scope of the easement taken by the defendant in 1956 must be resolved against it. To permit the construction of 161,000 volt electric transmission line or lines by the use of a "Berlin Wall" under the plaintiffs' land by which they were compelled to pay the sum of $18,000 to have the construction company lower the "wall" so they might use their land to construct sewage lines without interference, is to grant a right the legislature never contemplated. I would reverse the judgment.